The opinion of the Court was delivered by
Duncan, J.
The prisoner was tried before me at Nisi Prius, and acquitted on the first count, and found guilty on the second; and he now prays for a new trial—
1st. For that there was no legal evidence of the existence of such bank.
2d. That there was not any legal evidence that the note was a forged one.
3d. That there was not sufficient evidence that the note produced on the trial, was the note uttered and passed by the prisoner to Thomas Entrikin.
Had this bank been stated to have been a chartered bank, or had the second count laid the act as done with an intention to defraud such bank, it might have been incumbent on the State to have proved the existence of the corporation, and this could only have been done by the production of the charter or act of incorporation.
The offence charged, is the unlawfully publishing, as and for a true and genuine note, a certain false, forged, and counterfeited paper, purporting to be a bank note of the Merchants’ Bank, knowing it to be false, with an intention to defraud *570 Thomas Entrikin. Was the note a false note—was it publjshed with an intention to defraud Thomas Entrikin? The crime consists in this. Whether there was such bank, charterej or unchartered, in rerum natura, or not, the passing a no(;e un(jer ^at description as a true and genuine one, would be a forgery; for uttering a note in the name of a person who never had existed, is a forgery. Anne Lewis’s case, Foster, C. L. 116. James Holland's case, Leach, 83. Moreover, an instrument may be the subject of a forgery, although, in fact, it should appear impossible for such an instrument forged to exist, provided the instrument purports on the face to be good and valid as to the purposes for which it was intended to be made, as forging and publishing a will of a person- living at the time of trial. John Stag’s case, Leach, 103. Murphy’s case, 10 State Trials, 183. So indorsing a bill in a fictitious name. There was then no necessity to prove the existence of the bank, more than the being of a person who purports to have made the instrument, unless it was laid with an intention to defraud such bank or such person. Here Thomas Entrikin, the man defrauded, had an existence, and was examined as a witness on the trial. The act done was to the prejudice of his right; it falls within the definition of forgery, which is the fraudulently making an alteration of a writing to the prejudice of another. It is difficult to conceive a case where such act, tending to defraud, whether in the name of a real or fictitious person, is not punishable as a forgery. In England, all such offences are made capital by statute ; but they are punishable as misdemeanors at common law. Now, in the case before us, a fraud was committed, a prejudice to his right, by means of this false instrument, purporting, appearing; and being called as a true and genuine one. On the trial, a doubt passed over my mind, whether it was not necessary to prove the being of the bank by producing the charter, and the point was reserved. This was but the doubt of a moment ; the law is clear that it is not necessary, as the indictment did not state this to be a chartered bank, nor in the second count was it laid to be done to their injury.
It has been contended that there was no legal evidence that this was a false note ; and first, it is said that this could only be proved by the president and cashier, whose signatures are alleged to be forged; and again, if it was competent to prove that fact by others, it should be by witnesses who *571 have seen them write. If the first position be correct, it is time the Legislature should change the law; for it would render the proof in all cases most inconvenient and difficult, and, in many cases, impossible. If the persons whose names are on the instrument are interested, they are excluded from giving testimony in England, but admitted in Pennsylvania. If they live in another State, you cannot 'compel their attendance; nor can their testimony be taken on a commission, unless by consent. In the case of the Bank of the United States, it would afford absolute impunity, for it would be impossible that the officers of that institution could attend at Boston and at Nexv Orleans. The law requires no such inconvenient, difficult, and, in many cases, impossible evidence. If the testimony given by Mr. Campbell, the cashier of the Philadelphia Bank, had been, that from comparison of hand-writing only, he proved this note false-and counterfeit, I should long pause before, in a criminal case, I would hold such evidence to be legal, although it has been settled in Pennsylvania, that, in criminal cases, such evidence is admissible ; and although, as a general proposition, it may be true that as to the. competency or admissibility of evidence, there is no difference in civil or criminal cases. The evidence given was not that of comparison. Comparison of hand-writing is when other witnesses prove a paper to be ■ the hand-writing of a party, and the witness is desired to take the two papers in his hand, compare them, and say whether they are or are net the same hand-writing. There the witness collects all his knowledge from comparison only ; he knows nothing of himself; he has not seen the party write, nor held any correspondence with him ; but here the witness swears that, in his official character, he has held a correspondence with the Merchants' Bank in Nexv 1'ork for many years ; that his letters have been addressed to Lynde Catlin, cashier, and answered by him; bills remitted, and receipts acknowledged; and it is from the knowledge so acquired, he pronounced the signature, Lynde Catlin, to this note, not to be the signature of Lynde Catlin, the cashier of this bank. This evidence is not mere speculation, but knowledge acquired in a certain and direct way; is much more satisfactory than that of the man who had casually seen the party write ; this knowledge is placed in the same scale of credit as that of him who has seen the party write. Where there has been a fixed correspondence by letter, this *572 will enable the witness to swear to that person’s hand-writing, though he has never seen him write. Lord Ferrers v. Shirly, Fitzgib. 195. Gould v. Jones, 1 W. Bl. 384. To provea . f . . . , J. , , , r , hand-writing forged, a witness who had frequently corresponded with the person, but had never seen him write, was admitted, and his evidence held sufficient. And such evidence was received in Tilford v. Knott, 2 Johns. Cas. 211; and Chief Justice Kent speaks of it as a usual course to prove previous knowledge from his having seen the party write, or from having received authentic papers in the course of business, or corresponded by letters. And in high treason, such testimony has been received. Layer’s Case, 6 St. Tr. 275. Witness, from letters which he received, and transacted the business according to the letters, and been paid, testified from this knowledge to hand-writing; and the Court there says, no body could doubt, that according to the usual course and rule of evidence, a writing so proved ought to be read.
The evidence was clearly admissible ; but the witness further stated, that from his knowledge of the notes of this bank, the paper, type, and whole appearance, the note was forged and counterfeited.
The remaining objection is, that Thomas Entrikin, though he swore he received from the prisoner a five dollar note, purporting to be as stated in the indictment, which note he delivered to the mayor when he charged the prisoner with the offence, yet that the note given in evidence was not the note he received from the prisoner, or delivered to the mayor; because that note was torn at the bottom; and his son testified he believed it not to be the note, because it was not torn at all. Had this case rested here, the evidence might not have been sufficient; but the mayor and Mr. Peters were examined, who deposed that this was the very note, from indications made at the time, the initials of Thomas Entrikin, the mayor, and of Mr. Peters; and that the' note, thus designated, was immediately locked up, and afterwards delivered to the attorney general. It is true Thomas Entrikin declared that the initials T. E. were not of his hand-writing. Thomas Entrikin and son might be mistaken ; one of them certainly was. It is not the note, says the father, because that note was torn at the bottom; it is not, says the son, because the note was not torn at all. But the mayor and Mr. Peters cannot be mistaken ; it is not impression or recollection, as it was *573 at the moment marked in such manner as to prevent all idea of mistake. Thomas Entrikin received but one note from the prisoner, a five dollar note of the same description ; that note ■was delivered to the mayor, and, in the presence of all, was identified in such precise manner, as that no unprejudiced man can question its identity. This was left to the jury; and so far from entertaining any doubt, from the evidence itself, as well as fromthe demeanor of the-witnesses, without any impeachment of the character of the two. Entrikins, I am wholly satisfied that the jury drew the just conclusion, that the Entrikins were mistaken, and that the note given in evidence was the note Thomas Entrikin received from the prisoner, and delivered to the mayor. The motion is, therefore, overruled.
New trial refused.