# CASES

IN THE

# APPELLATE COURTS OF ILLINOIS.

77 365
s182s 76

## FOURTH DISTRICT—FEBRUARY TERM, 1898.

## John Penn, Trustee, etc., et al., v. W. M. Fogler et al.

1. EQUITY PRACTICE—*Sustaining Decrees.*—Where a cause is heard by the chancellor in open court upon oral and documentary testimony, his finding of facts should not be disturbed unless clearly contrary to the weight of evidence.

2. WILLS—*Intention of the Testator Must Prevail.*—It is a cardinal rule of construction that the intent of a testator must be given effect when it can be ascertained, and where the testator has not accurately or completely expressed his meaning by the words he uses, such words may be supplied from the context as will effectuate his intention.

3. DECREES—*In Invitum and by Consent.*—Where a defendant is ruled to answer, and failing to do so, default is taken and decree entered *pro confesso*, such is a decree *in invitum*, and not a consent decree.

4. ADMINISTRATORS—*With the Will Annexed—Power to Sell Real Estate.*—An administrator with the will annexed, has no power to sell real estate without an order of court, although the will may have directed its sale by the executor.

5. SAME—*Duties in the Nature of Trusts.*—In the administration of personal property, and trusts in relation to the payment of legacies from personal property or its earnings, all the duties of an executor, which rest upon him by virtue of his office, devolve upon an administrator *cum testamento annexo*, unless it appears from the will that such duties are cast upon the executor by reason of personal trust and confidence.

6. SAME—*Jurisdiction of the County Court—After Decree Construing the Will.*—Where a controversy arises over the construction of a will and the distribution of trust funds in the hands of an administrator with the will annexed, a proper disposition of the case will not take the estate out of the hands of the County Court, but when the will is construed, and the rights of the parties determined, the settlement of the estate can proceed in the County Court.

(365)

7. PARTNERSHIP—*Liability of a Copartner for Misapplication of Trust Funds.*—The knowledge of one partner that a trust fund is misapplied does not make his copartners liable if, in the vicissitudes of business honestly conducted, the investment proved unprofitable.

8. SAME—*Liability for Breach of Trust.*—If in making an investment one partner is guilty of a breach of trust, and his partners have knowledge of such breach, all the partners having such knowledge will be chargeable as co-trustees.

**Bill to Construe a Will and for Relief.**—Error to the Circuit Court of Fayette County; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the February term, 1898. Affirmed. Opinion filed August 31, 1898.

## STATEMENT.

Nathaniel M. McCurdy, a resident of Vandalia, died testate September 29, 1876, leaving surviving him no widow, and no child or descendant of any child. By his will he bequeathed two hundred shares of the capital stock of the National Bank of Vandalia, having a par value of one hundred dollars per share, to McKendree College, a corporation organized under the laws of the State of Illinois; and two hundred shares of said stock to the Board of Church Extension of the Methodist Episcopal Church, a corporation organized under the laws of the State of Pennsylvania. The total capital stock of the bank was $100,000. At the time of the death of the said McCurdy the shares of stock were at par and probably at a premium.

Out of the earnings of said shares, $3,000 was to be paid annually to Mary K. Marr, and after death to her daughters, Henrietta Marr and Imogene Marr, so long as they lived, and to the survivor during her life. The mother is dead. The daughters are still living. After the payment of the legacies charged against the bank stock, including the annuities to the Marrs, the shares of bank stock were to be transferred to the corporations last named.

No executor or trustee was named in the will.

George W. Brown, the cashier of said National Bank, filed and probated the will, and was appointed administrator with the will annexed. Brown filed his inventory as admin-

istrator on January 8, 1877, but the estate is still pending for settlement in the County Court of Fayette County. He received in custody, as administrator, all of the personal property of McCurdy, including 400 shares of bank stock.

The will directed a sale of all the property, real, personal and mixed (except the bank stock), of which the testator died seized or possessed. At the February term, 1877, of the Fayette County Circuit Court, Brown filed a bill in chancery, the object of which was, as he testifies, "to construe the will and determine my powers under it to conduct the business, including the bank stock." There is a disagreement between the parties as to the scope of this bill. It has been lost or mislaid. Counsel for complainant in the cross-bill, in whose possession the bill last was, testifies that it only asked for authority to sell real estate.

The Marrs, McKendree College and the Board of Church Extension were made parties defendant to the bill, and their appearance was entered in writing. The decree was a final decree and is still in effect. As administrator with the will annexed, Brown sold all the property of the deceased, except the bank stock; he assumed the charge and management of this stock; represented it at the meetings of the directors and stockholders of the bank, collected the dividends thereon, paid the definite legacies charged against it, and paid the annuities to the Marrs up to the time of the surrender of the bank's charter, and for some years thereafter.

McCurdy was the president of the said National Bank of Vandalia, from its organization in 1866, to the date of his death. Brown, during most of that time, acted as cashier. On the 1st of April, 1883, said bank, in pursuance of a resolution adopted by its stockholders, surrendered its charter, and did no business after April 2d. The chief reason for this was, the bonds which secured its notes had matured and were called for redemption, and the premium on bonds, which would be required to take their place, was twenty-eight per cent. It was not thought advisable to pay this premium in order to continue as a national bank. The banking business was therefore continued by a private bank, called the

Bank of Vandalia, which commenced operations on the day after the national bank ceased, at the same place, with the same assets, stockholders and directors. Brown, under the name of administrator with the will annexed, continued in this bank, as an investment, whatever assets of the McCurdy estate there were remaining in the said National Bank, when its charter was surrendered.

What the value of these assets was, at that time, does not clearly appear.

· The report of the National Bank to the comptroller, December 30, 1882, showed total resources to be $330,673.96; total liabilities, $190,928.27, leaving net resources, $139,745.69.

But of this net balance there were many debts, imperfectly secured, and resulting in a heavy loss.

Brown, who was cashier of both banks for many years, testifies, " from present standpoint as I view it now, had we closed up the business at the time of the reorganization, I don't believe the stockholders would have realized fifty cents on the dollar of their stock." He further testifies that " in the light of subsequent developments," its capital was impaired at the time of the reorganization to the extent of $69,088.

The Bank of Vandalia proved to be a disastrous investment. It continued in operation until May 1, 1895, and was then succeeded by the First National Bank of Vandalia. Steps were taken to close up the affairs of the Bank of Vandalia at the September term, A. D. 1896, of the Fayette County Circuit Court, by the original bill in this case filed.

Said original bill was filed by W. M. Fogler, G. D. Gerauld, George W. Brown, administrator with the will annexed of the estate of Nathaniel M. McCurdy, deceased, W. M. Farmer, J. J. Brown, George Leidig, C. E. Capps, Joseph A. Gordon, administrator of the estate of F. Reman, deceased, Fred. M. Whiteman and J. E. Whiteman, executors of the last will and testament of James M. Whiteman, deceased, Lucinda R. Haller, Maud Haller, Maud Haller,

administratrix of the estate of F. B. Haller, deceased, Mary Strayer, Olivia Whiteman, Julia Reman, and Julia Reman, guardian of Fred. G. Reman, minor heir of F. Reman, deceased, Mary I. Henninger, Julia Fouke, Mary Wagner, Josephine Gregory, Ada Perkins and Fred G. Reman, minor heir of F. Reman, deceased, by Julia Reman, his guardian and next friend, against Simeon Perkins, Benjamin Perkins, Harriet Perkins, Imogene. Marr, Henrietta Marr, McKendree College, and the Church Extension Society of the Methodist Episcopal Church.

The bill avers that on and prior to April 2, 1883, there existed in the city of Vandalia, Illinois, a national bank, known as the National Bank of Vandalia, doing a general banking business, under a charter issued to it under authority of the National Banking Act, with a paid up capital stock of $100,000. That on April 2, 1883, the said stock was owned and controlled by the following persons, in the following proportions: N. M. McCurdy estate (George W. Brown, administrator), $40,000; Lydia A. Fogler, $15,000; W. M. Fogler, $9,000; F. Reman, $15,000; F. B. Haller, $6,000; Simeon Perkins, $4,000; James M. Whiteman, $2,000; G. D. Gerauld, $2,000; George Leidig, $1,000; Mary I. Henninger, $2,000; Charles E. Capps, $1,300; Josephine Gregory, $1,400, and Julia Fouke, $1,300.

That the bonds deposited by said bank to guarantee its circulation, were called in for redemption. That premium on United States bonds being at that time high, the said stockholders decided to surrender the charter, and continue the banking business as a copartnership, which was done. That from and after April 2, 1883, the same persons continued said banking business, with the same capital, as a partnership, until May 1, 1895, with the exceptions herein set forth. The partnership agreement being that the partners were to share in the profits and losses, in proportion to the amount invested by each respectively.

That Lydia A. Fogler withdrew June 18, 1887, and thereafter until May 1, 1895, said partnership was carried on with a capital of $85,000.

That Simeon Perkins died August 25, 1890, leaving Ada
Perkins, his widow, and Simeon, Benjamin and Harrietta
Perkins his only children and heirs at law, who succeeded
to his rights and interests in said partnership. That upon
the settlement of his estate, $1,500 became the property of
the widow, and $2,500 became the property of the heirs.
That the same was continued until the dissolution of the
firm in said bank.

That Whiteman died testate February 10, 1894, leaving
Olivia Whiteman, widow, and Fred M. J. E. and George
Whiteman, only children and heirs at law. That by the
last will and testament of said Whiteman, his interest
became the property of said Olivia Whiteman, who con-
tinued same therein until the dissolution of the firm.

That on ———————— W. M. Farmer and J. J. Brown each
bought of Mary I. Henninger $500 of her interest, and there-
upon were admitted as partners. That on ——————— Mary
Wagner bought of W. M. Fogler $4,000 of his interest and
was thereupon admitted as a partner. That on the dissolu-
tion of the firm the interests of its members were as follows :
N. M. McCurdy estate, $40,000; F. Reman, $15,000; Mary
Wagner, $4,000; W. M. Fogler, $5,000; F. B. Haller estate,
$6,000; J. M. Whiteman estate, $2,000; G. D. Gerauld,
$2,000; Mary I. Henninger. $1,000; W. M. Farmer, $500;
J. J. Brown, $500; George Leidig, $1,000; C. E. Capps, $1,300;
Josphine Gregory, $1,400; Julia Fouke, $1,300; Ada Per-
kins, $1,500; heirs of Simeon Perkins, $2,500.

That during the continuation of business a large amount
of real estate was taken in the settlement of bad debts.
That the firm has other assets consisting of notes and other
evidences of indebtedness. That said assets should be
reduced to money to pay creditors and make distribution.
That the real estate is not held in the firm name, but for
convenience, in the name of different members of the firm,
in trust. That the parties can not sell and make title on
account of the minority of Reman and the Perkins heirs.
That no settlement of the partnership affairs has ever been
made.

Avers that the will of McCurdy provided for the payment of an annuity to Henrietta and Imogene Marr, during their life, out of the earnings of the capital invested in the banking business, and at their death, said capital to be divided between McKendree College and the Church Extension Society of the Methodist Episcopal Church, one-half to each.

Prays for the appointment of a guardian *ad litem* for minor defendants, for a receiver of the firm assets, for instructions to receiver to wind up partnership affairs under the direction of the court, and after payment of liabilities, for a distribution, and for general relief.

Schedule of real estate was attached to and made a part of bill as Exhibit "A."

McKendree College, the Board of Church Extension, and Henrietta Marr and Imogene Marr entered their appearance as parties defendant. Proceedings were had resulting in the appointment of a receiver who took possession of the firm assets.

At the same term of court, McKendree College and the Board of Church Extension filed their bill in chancery, making George W. Brown and the Marrs defendants, setting up the will and death of McCurdy, and praying for the appointment of a trustee to carry out the provisions of the will in relation to the bank stock. A decree was had appointing plaintiff in error, John Penn, trustee, and ordering Brown to account to said Penn for said fund, and to turn the same over to him. At the same term of court, said trustee, upon his own motion, was made party defendant to the original bill to close up the affairs of the Bank of Vandalia, and answered said bill. Said answer admits the formation of a partnership to do a banking business; avers that Brown was a partner and that he contributed the proceeds of the 400 shares of National Bank stock to the partnership assets; that all the partners knew that Brown had said funds as administrator of the McCurdy estate, and was subject to the order of the Fayette County Court. Avers that Brown had no authority to make this invest-

ment.  Admits that said copartners agreed to share the profits and losses of the partnership, but denies any such agreement on the part of McCurdy's legatees.

Having answered the original bill, plaintiff in error filed his cross-bill, which avers his appointment as trustee; the death of McCurdy; the probate of his will; his ownership of 400 shares of the capital stock of the National Bank of Vandalia; its bequeathal to McKendree College and to the Board of Church Extension; its value as a hundred dollars a share at the time of McCurdy's death; the annuity of $3,000 to be paid out of the earnings of the bank stock to Mary Marr during her life, and at her death to her daughters, Henrietta Marr and Imogene Marr, in equal parts, and at the death of either, the survivor to receive the whole $3,000 annually during her life.  Avers the death of Mary Marr, and that her daughters are still living.  Avers the appointment of Brown as administrator with the will annexed, and that he is still acting as such, and that the estate is still unsettled; that as such he received the said bank stock, which was then worth $40,000.  Avers the surrender of the charter of the national bank, and the formation of a partnership by the stockholders and Brown to transact a banking business; that they called the partnership fund "capital stock," and that Brown contributed the proceeds of the 400 shares of the National Bank stock to this partnership fund; that each of his copartners knew that no part of this amount belonged to Brown, but knew that it was the property of McCurdy's legatees.  Avers that Brown was chosen cashier of said bank and continued as such until it ceased to do business in May, 1895; that among its liabilities is the said sum of $40,000, with lawful interest thereon, which is due complainant in cross-bill as trustee.

The cross-bill makes all parties to original bill parties defendant to the cross-bill, except McCurdy's legatees, and prays that the $40,000 and interest be deemed a liability of said partnership and a prior lien upon its assets; and that if the assets are not sufficient to discharge said liability that a money decree for the residue be rendered against defendants to cross-bill, and for general relief.

Josephine Gregory, Julia Fouke and Olivia Whiteman, were, by order of court, dismissed as complainants in original bill, and made parties defendant with leave to answer.

They answered, denying that they entered into said partnership as partners.

Joint and separate answers of all of the defendants, except George W. Brown, were filed. They deny that the bank stock was worth $40,000 when Brown received it as administrator, and deny that he contributed $40,000 to the partnership, which was a part of the McCurdy estate, or that they had notice of it; and deny indebtedness to the beneficiaries of McCurdy. They aver that said national bank ceased to do business, but that the same business was carried on at the same place, with the same directors, stockholders and assets. Aver that the continuation of said business in this way was in accord with the terms, conditions and true construction of McCurdy's will. Aver that whatever use was made of said fund, by either of said banks, was well known to McKendree College and the Board of Church Extension; that they consented thereto and acquiesced therein, from the death of McCurdy until the filing of the cross-bill, a period of twenty-three years; and set up *laches*, and the ten and five year statutes of limitation. Deny that cross-complainant is entitled to a prior lien on the assets of the copartnership.

The separate answer of George W. Brown, in addition to the foregoing answer, avers that it was the duty of the administrator to keep said bank stock invested to pay the annuities; and that McKendree College and the Board of Church Extension are not entitled to the possession of said bequest until after the death of the annuitants. Avers that he retained the stock in the national bank as long as it had existence, and then retained it in the private bank, the change being in name only. That at the time of the surrender of the charter of the national bank, the McCurdy stock was not worth $40,000 or any considerable portion thereof. That the said charter was surrendered because the bonds were called in for redemption, and other

bonds were not bought because the premium was too high. That the total amount received on sale of bonds, when charter was surrendered, was less than $10,000. That the organization of said partnership to continue the business was what prudent and careful men would have done under the circumstances. That McKendree College and the Board of Church Extension knew it at the time of the change and consented to it, acquiesced in it, and ratified the same, and counseled and advised with defendant on frequent occasions about the business.

W. M. Fogler et al. amend answer to original bill averring filing of bill by Brown in Circuit Court of Fayette County, at the February term, 1877, for construction of will, and for the appointment of a trustee to carry out the provisions of the will concerning the bank stock, and for authority to sell the real estate. That McKendree College and the Board of Church Extension were defendants thereto and entered their appearance in writing. That a decree was had empowering complainant to carry out all the provisions of the will and especially gave him all powers, rights, duties and authority that an executor could or would have had if named in the will. That said decree gave Brown full authority to continue said fund in partnership bank.

Brown amended his answer, setting up in addition the same as above. Three reports were made by him as administrator to the County Court of Fayette County. The first covers the time from November 30, 1876, to March 8, 1879, the date of filing the report. In it he charged himself with six five per cent semi-annual dividends on the stock, amounting to $12,000, and takes credit for $3,000 legacy paid to M. E. Church, and five semi-annual annuities to Mary K. Marr, of $1,500 each, amounting in all to $10,500. He charges himself also with a balance due the estate of $50,471.50, which includes the $40,000 bank stock. The second report is from March 8, 1879, to February 18, 1884, and is filed March 17, 1884. In it he charges himself with interest to February 18, 1884, amounting to $12,916.06, and takes credit for ten semi-annual annuities to Imogene and

Henrietta Marr, amounting to $15,000. He charges himself with a balance of $40,000, representing the bank stock.

The third annual report covers the time from February 18, 1884, to February 18, 1896. In it he charges himself with fifteen items of dividends to January 15, 1895, aggregating $33,600, and takes credit for sixteen semi-annual annuities of $1,500 each, and two of $1,000 each, to Imogene and Henrietta Marr, in all $26,000. He also takes credit for $13,200 commissions, and for $25 paid for legal services, and claims a deficiency due him of $5,625. He also charges himself with 400 shares of bank stock in the Bank of Vandalia, total principal $40,000.

The clauses of the will important to be considered are as follows:

"Also I give and bequeath unto my sister, Mary K. Marr, now of Portland, State of Maine, three thousand dollars annually, out of dividends to be made on the earning of my shares of stock of the N. B. of V., or semi-annually, if so preferred by the bank, beginning as soon after my decease as may be convenient, and continued as long as she may live, which can not, in the common course of nature, be long—and after her death, the same to be divided between her two daughters, Imogene Marr and Henrietta Marr, as long as they may both live. At the death of either, let the same be paid to the survivor, as long as said survivor shall live, at the death of whom it shall cease.

" The means to meet and discharge all the legacies in this will hitherto devised will be found in the earnings of my bank stock, and when they are all fully discharged I hereby will, bequeath and devise unto the proper government of McKendree College, for the use and behoof of said college, to endow and support, and maintain and continue in use a professional chair, to be known as the ' McCurdy Professorship of the Pure and Applied Sciences;' two hundred shares of one hundred dollars each, to be transferred on the books of the National Bank of Vandalia, to the credit of said McKendree College, the earnings of which shall be appropriated exclusively to the salary of the professor and

the purchase of apparatus for the use of such chair, in such proportions as the government of the college may agree upon. The said stock shall ever be considered as a perpetual endowment of said professorship, and no part thereof shall ever be diverted to any other use, but it shall be kept upon the best interest obtainable, and the interest alone annually expended. After the transfer of stock to the college or its authorized agent is made, and the college becomes the legal proprietor of that amount of capital stock, it, the college, will be entitled to a participancy in the management of the National Bank of Vandalia, and may continue so, or sell out the stock and invest elsewhere, as they may determine, for the benefit of the endowment, but as the condition of things now is, I would advise that it be kept as stock in the bank, so long as the bank may hold an existence as such, and then seek other investment.

"I also give, devise and bequeath to the 'Church Extension Society' of the Methodist Episcopal Church, a body corporate under the laws of the State of Pennsylvania (the corporate name of the society may, at this writing, be somewhat changed, but let it be understood that I mean the society once known by the above title), two hundred shares of the capital stock of the 'National Bank of Vandalia,' together with all the rights and privileges thereunto belonging or in any way appertaining, and as it is but a natural desire on the part of most men to have kept alive the name and remembrance of departed loved ones, and that it may induce others to follow my example, I make it a condition in receiving this legacy, on the part of the 'Church Extension Society,' that it shall ever be known in both law and equity, as the 'McCurdy Fund for Church Extension.' I also will and ordain that my executors shall on the best terms they can make and within a reasonable time after my death, sell all the property, real, personal and mixed, of which I may die seized and possessed, or to which I may be entitled at the time of my decease, and the avails of such sale, after all expenses and charges shall be fully met, and all just demands against my assets are discharged and paid,

Penn v. Fogler.

and the money received (kept on interest when the amount is too small to meet a legacy) shall be divided and paid over to the proper persons authorized to receive the same, as follows: To the 'Fayette County Bible Society,' of which I acted as secretary for twenty years, three hundred dollars; to the sisters, Imogene and Henrietta Marr, both of Portland, Maine, three thousand dollars each, if both shall be living at the time when the money may be ready for distribution; if one should be dead the survivor shall be entitled to receive the share of the other; and to Elizabeth Pingree, also of Portland, Maine, three thousand dollars, and to Mrs. Eliza Watson, now of Cairo, in Illinois, one thousand dollars; and to the four daughters of Samuel McCurdy, all of Augusta, State of Arkansas, one thousand dollars each, if all shall be alive; if one or more be dead, the whole to go to the survivors in equal proportions.

"And all the rest, residue and remainder of my estate and effects, whether personal, real or mixed, whatsoever and wheresoever, not herein before otherwise effectually disposed of, I do give, devise and bequeath unto the Missionary Society of the 'Methodist Episcopal Church.'"

The following is an abstract of the decree rendered in this case, which is before us for review by writ of error.

It finds that McCurdy executed his last will June 1, 1874, and died September 29, 1876. That the will was probated November 30, 1876, by order of the County Court of Fayette County. That at the time of making his will, and at the time of his death, he owned four hundred shares of the capital stock of the National Bank of Vandalia, of the par value of $100 per share. That in said will he provided that $3,000 per annum should be paid from the dividend or earnings of said stock to Mary K. Marr during her life, and after her death the same to be paid to her daughters, so long as either of them might live. That after the full discharge of this burden two hundred of said shares should be transferred to McKendree College, and the remainder to the Board of Church Extension of the Methodist Episcopal Church. That testator named no executor or trustee to carry the said will

into effect. That on November 30, 1876, George W. Brown was, by the order of the County Court of Fayette County, Illinois, appointed administrator with the will annexed, and thereupon entered upon the discharge of his duties as such. That in pursuance of such duties he filed in the Circuit Court of Fayette County, February, 1877, his bill in chancery, making, among others, said McKendree College and said Board of Church Extension parties defendant; that said named defendants entered their appearance as defendants to said bill; that the court had jurisdiction of said defendants and of the subject-matter of said bill. That at said term a final decree was rendered, granting to said Brown authority to dispose of said bank stock for the uses and purposes in said will mentioned, and giving him "all the power, rights, duties and authority that an executor could have, if named and mentioned in said will." That said decree remains in full force. That said Brown at once undertook to administer the estate and carry into effect the provisions of the will. That said stock was then earning dividends and constituted two-fifths of the capital stock of said bank; that Brown received such dividends, and that said stock lawfully remained invested in said bank as long as said bank had an existence. That Brown had lawful right to represent said stock in the management of the bank's business, and to receive the dividends declared thereon. That co-stockholders were not intermeddlers with said fund, and received no part of the earnings of said four hundred shares, and were not co-trustees with Brown in the management of said trust. That said national bank ceased to exist April 2, 1883. That the intent of the testator was that said fund should be kept invested. That it was then Brown's duty to seek other investment, that in pursuance of that duty he, by title of George W. Brown, administrator with the will annexed of the estate of N. M. McCurdy, deceased, joined with all the other stockholders in the continuation of the business as a private bank. That said private bank had the same assets, was owned and controlled by the same persons as was the national bank, and

was known as the " Bank of Vandalia," and continued business until the filing of the original bill in this cause. That Brown continued to represent said fund in the management of the business of the said private bank. That it earned and declared dividends, of which Brown received the full two-fifths. That Brown had lawful right to continue said fund in said private bank, and had lawful right to represent it in the management of the said banking business as continued, and to receive dividends declared. That the co-partners were not intermeddlers with said fund or in the management thereof, but]were innocent co-investors, and not co-trustees. That McKendree College and the Board of Church Extension during the entire course of said business knew of said will, of Brown's appointment as administrator, of aforesaid decree, and that Brown had undertaken the management of said fund. That said McKendree College and said Board of Church Extension by decree of this court procured the appointment of John Penn, trustee, and said Penn is entitled to succeed Brown in the management of said fund. That by decree of this court said banking business and all its assets have been placed in the hands of a receiver. That said partnership has creditors, and such creditors have a prior right to be paid out of the assets of the partnership. That after the payment of the said indebtedness and the costs of the receivership, said Penn, trustee, will be entitled to the full two-fifths of all remaining assets. The court further finds that George W. Brown had lawful authority to manage said fund, to carry out the provisions of the will, until relieved by the death of all the annuitants, or by appointment by competent authority of his successor. That during the time said Brown had charge of said trust fund, said annuitants were living, and were entitled to receive the annuity. That he has properly accounted to the annuitants for all the income of said fund received by him, and under order of this court has turned over to the receiver appointed herein all the assets of said fund.

It is decreed that the receiver heretofore appointed by decree, proceed with due diligence to execute said decree.

That he shall pay first Lillie West $963 and interest out of certain specified assets. That out of assets which are now or may hereafter come into his hands, he pay first the costs of the receivership, next pay the creditors of the firm in full. That after all such indebtedness is paid in full he shall deliver to John Penn, trustee, or his successor in trust, two-fifths of the remaining assets, and to each of the complainants in the original bill, except George W. Brown, their ratable proportion according to their respective interests as set out in their said bill. Ordered that the receiver pay in due course of administration all the costs of this proceeding." Complainant in cross-bill, John Penn, trustee, excepts.

FRED. B. MERRILL and ROBERT A. MOONEYHAM, attorneys for plaintiffs in error; G. A. KOERNER, of counsel.

Members of a joint stock company are liable as partners. Where there have been changes in the firm and the reorganized firm takes the assets and assumes the liabilities and continues the business, the new partners are liable for the debts, and those who were by the reorganization discharged need not be made parties defendant in a suit against the firm. Wadsworth v. Duncan, 164 Ill. 360; Wadsworth v. Laurie, 164 Ill. 42.

The equitable owner of a trust fund invested in such a partnership can not be deemed a partner where such investment is made without his knowledge, and the affairs of the firm managed without his participation. Wadsworth v. Duncan, 164 Ill. 360.

Where a trustee mixes a trust fund with his own private funds, as between him and the *cestui que trust*, the *cestui que trust* may follow the trust fund and claim every part of the blended property, unless the trustee can identify his own. Halle v. National Park Bank, 140 Ill. 413.

A trustee is liable for misconduct or breach of trust or negligence, as well as for money actually received. And if in these ways he injures the *cestui que trust* he is liable, whether he himself gains by his misconduct or not. Taylor v. Benham, 46 U. S. (5 How.) 275.

PATTON, HAMILTON & PATTON, attorneys for defendants in error.

The rule is that, as respects the management of personal property, and trusts in relation thereto, all the duties of an executor, which are cast on him by virtue of his office, devolve on the administrator with the will annexed, unless it necessarily appears from the will that such duties were cast upon the executor in personal trust and confidence by the testator. 1 Williams on Executors (7th Am. Ed.), 563, 564; Knight v. Loomis, 30 Me. 209; Woerner on Adm., Sections 178, 245; Blake v. Dexter, 12 Cush. 559; Buttrick Adm. v. King, 7 Met. 20; Farwell v. Jacobs, 4 Mass. 634; Hall v. Cushing, 9 Pick. 395; Dorr v. Wainwright, 13 Pick. 328; DePeyster v. Clendining, 8 Paige, 311.

Where the decree of such a court is relied on collaterally, jurisdiction must be presumed, although it fails to appear in the record. It appears to be unquestioned law that where the court has jurisdiction of the parties and the subject-matter in the particular case, its judgment, unless reversed or annulled in some proper proceeding, is not open to attack or impeachment by parties or privies in any collateral action or proceeding whatever. 1 Black on Judgments, Sec. 245; Freeman on Judgments, Sec. 330; Wells v. Mason, 4 Scam. 84; Iglehart v. Pitcher, 17 Ill. 308; Wallace v. Cox, 71 Ill. 549.

It is the duty of the trustee of a fund which is charged with the payment of annuities to keep the fund invested, and a court of equity will protect him if he does so. Welsh v. Belleville Bk., *supra;* 13 Am. & Eng. Ency. 202; Burnett v. Lester, 53 Ill. 325; Howe v. Earl of Dartmouth, 7 Vesey, 137.

Even without the decree appointing him trustee Brown's duty was to keep the fund invested. Carson v. Carson, 6 Allen, 397; Dorr v. Wainwright, 13 Pick. 328; Dole v. Johnson, 3 Allen, 364.

MR. JUSTICE WORTHINGTON delivered the opinion of the court.

This cause was heard by the chancellor in open court

upon oral and documentary testimony. His finding of facts should not then be disturbed unless clearly contrary to the weight of evidence. Burgett v. Osborne, 172 Ill. 227; Maratta v. Anderson, 172 Ill. 377.

The errors assigned, which are important to be considered, are, first, that the Circuit Court erred in refusing to decree an accounting by the defendants in the cross-bill of John Penn, trustee, for the trust fund mentioned in the cross-bill, together with lawful interest thereon; second, the Circuit Court erred in refusing to decree an accounting by George W. Brown, administrator with the will annexed of Nathaniel M. McCurdy, deceased, to John Penn, trustee, for the trust-fund mentioned, together with lawful interest thereon.

Plaintiff in error urges two propositions for the consideration of this court :

1st. That George W. Brown had no authority to manage or invest the trust fund, meaning the 400 shares of bank stock.

2d. That if he had authority to manage or invest the fund, that it was so carelessly and improperly managed by said Brown and his associates, that this management, with their payment of unearned dividends, amounted to *devastavit* of the fund, and thereby renders them jointly and severally liable for it.

The consideration of the first proposition involves the construction of the will of McCurdy, and an examination of the decree of the Circuit Court of Fayette County rendered at its February term, A. D. 1877.

The will of McCurdy appears to have been drafted by himself, and with the intention to name executors in it, but none were named. In one place it states, " The $3,000 (to the M. E. Church) shall be paid by my *executors* hereinafter to be named, as soon after my decease as they may be able to discharge all other bequests I make in this will, out of my dividends on my bank stock in the National Bank of Vandalia."

And in another place, " I also will and ordain that my

*executors* shall, on the best terms they can make and within a reasonable time after my death, sell all the property, real, personal and mixed, of which I may die seized, * * * and the money received kept on interest when the amount is too small to meet a legacy, shall be delivered and paid over to the proper persons authorized to receive the same, as follows," etc.

It is evident by these citations, that when drafting his will he intended that it should be administered by executors selected by himself.

It is also evident that the clause, "I also will and ordain that my executors shall * * * sell all the property, real, personal and mixed," must be considered and construed with the clauses referring to the bank stock. In other words, it was not his intention that his bank stock should be sold with his other personal property. He intended this to produce earnings to pay the Marrs' annuities as long as any one of them lived, and expected it to remain bank stock. The language of his will is: "The means to meet and discharge all the legacies in this will hitherto devised will be found in the earnings of my bank stock, *and when they are all fully discharged* I hereby will, bequeath and devise unto the proper government of McKendree College * * * to endow and support, and maintain and continue in use a professional chair, to be known as the McCurdy Professorship of the Pure and Applied Sciences, two hundred shares of one hundred dollars each, to be transferred on the books of the National Bank of Vandalia, to the credit of McKendree College, the earnings of which shall be appropriated to the salary of the Professor, etc. * * * The said stock shall be considered as a perpetual endowment, and no part thereof shall ever be diverted to any other use. * * * After the transfer of stock to the college or its authorized agent is made, and the college becomes its legal proprietor of that amount of capital stock, it, the college, will be entitled to a participancy in the management of the National Bank of Vandalia, and may continue so or sell out the stock, and invest elsewhere, * * * but as the con-

dition of things now is, I would advise that it be kept as stock in the bank, so long as the bank may hold an existence as such, and then seek other investment."

From these extracts from the will of McCurdy, his intention with reference to the bank stock is clearly seen. It is a cardinal rule of construction, that the intent of a testator must be given effect when it can be ascertained, and where the testator has not accurately or completely expressed his meaning by the words he has used, those words may be supplied from the context which will effectuate his intention.  Glover v. Condell, 163 Ill. 584.

Supplying the words "except my bank stock," after the words "all my estate, real, personal and mixed," does effectuate the intention of the testator as gathered from the entire will.

No one having been named in the will as executor, it follows that no confidence was reposed in any particular person for its execution, which therefore devolved upon George W. Brown, as administrator *cum testamento annexo*.

At the February term, 1877, of the Fayette County Circuit Court, a decree was rendered in a proceeding in chancery, in which Brown was complainant, authorizing him to sell the real estate of the deceased, and granting, defining and affirming his powers, as follows:

" It is therefore further ordered, adjudged and decreed by the court, that said complainant, administrator of the estate of said McCurdy, transfer and dispose of said bank stock as in said will specified, and that it be so transferred and disposed of for the uses and purposes in said will mentioned, and that said administrator is hereby fully authorized and empowered to sell all of the other property of said Nathaniel M. McCurdy, deceased, including real estate, personal and mixed property, and to collect what is due said estate and to disburse the same as directed by said will.

"And it is further ordered, adjudged and decreed by the court, that said real, personal and mixed property may be sold, * * * and said complainant shall have generally all the powers, rights, duties and authority that an executor

could or might have, if named and mentioned in said will, and said administrator shall report all his actions and doings to the County Court of said Fayette County, as provided by law in reference to administrators."

The decree of the chancellor finds that McKendree College and the Board of Church Extension of the M. E. Church were made parties defendant to this bill, and entered their appearance, and that the court had jurisdiction both of the subject-matter and of the parties. We see no valid reason for a different finding.

It is urged by the complainant that the decree rendered is not in accord with the bill filed. That the bill sought only authority to sell real estate. There is a conflict of testimony as to the scope of the bill. One of the counsel for complainant, who had the bill for examination, testifies that while in his possession he was ill with typhoid fever eight weeks, and after recovery was unable to find the bill. That the only relief sought by it was for power to sell real estate.

Brown, the complainant in the bill, testifies that " the proceeding was to construe the will, and determine my powers under it to conduct the business, including the bank stock." In view of this conflict of evidence, we must presume that the decree is not broader than the bill, and was authorized by its allegations, prayer and the proofs offered. Every presumption is indulged to support the decree of a court of general jurisdiction. Wenner v. Thornton, 98 Ill. 156.

It is claimed, too, that it is in the nature of a consent decree, and for this reason is not conclusive.

The record shows that defendants were ruled to answer, and failing to plead, default was taken and decree *pro confesso*. Such a decree is a decree *in invitum*, and not a consent decree.

It is strongly urged, too, that the entry of appearance of the Board of Church Extension was improperly and fraudulently procured to be entered by complainant.

We have carefully examined the evidence upon this point

and do not think it sustains the charge. In any case, the decree was a final decree, is still in force, and all parties acquiesced in it and acted under it without question, so far as this record discloses, from February, 1897, until attacked in this proceeding, a period of nearly twenty years. It is too late now for parties to the case to question its validity.

Under the decisions in this State, an administrator with the will annexed has no power to sell real estate without an order of court, although the will may have directed its sale by the executor. Hall v. Irwin, 7 Ill. 176; Nicoll v. Scott, 99 Ill. 537.

It is held in these cases that "executors may act in a double capacity: as executors by virtue of their office, and as agents or trustees under a warrant of attorney; * * * and it is only the powers and duties of the executor, as such, resulting from the nature of his office, which devolve upon an administrator with the will annexed, and not an authority as trustee," etc.

An examination of Hall v. Irwin, above cited, shows that the case is decided with reference solely to the authority of an administrator with the will annexed to sell real estate. The inference from the reasoning employed in the case, and from the authorities cited, is that the limitation of the authority of such administrator, as compared with the authority of an executor, applies only to real property. It may be said, too, that the case of Conklin v. Edgerton's Adm., 21 Wendel, 423, cited in this opinion, has since been qualified in Mott v. Ackerman, 92 N. Y. 349.

We think that the weight of authority is, that, in the management of personal property and trusts in relation to the payment of legacies from personal property or its earnings, all the duties of an executor, which rest upon him by virtue of his office, devolve upon an administrator *testamento annexo*, unless it appears from the will that such duties were cast upon the executor by reason of personal trust and confidence.

This includes duties which are in the nature of a trust. Woerner on Adm., Vol. I, Sec. 178; Hall v. Cushing, 9 Pick.

395; Leslie v. Moser, 163 Ill. 502; Blake v. Dexter, 12 Cush. 559; Knight v. Loomis, 30 Maine, 209; Farwell v. Jacobs, 4 Mass. 634; Mott v. Ackerman, 92 N. Y. 539.

" The office of such administrator differs little from that of an executor." Hood on Executors, 978.

But, without reference to these authorities, the decree of February, 1877, gives to Brown all the rights, powers and duties that he would have had if he had been appointed executor of the will of McCurdy. The legal effect of this decree was to construe the will; and to give the administrator *testamento annexo* power to sell real estate; and as incident to his duties as such administrator, to grant and affirm his authority to transfer and dispose of the bank stock for the uses and purposes mentioned in the will, and to exercise all the " powers, rights, duties and authority that an executor could or might have if named in said will." If the investment of the bank stock for the purpose of earning money to pay the Marrs annuities was in the nature of a trust, there is in this decree ample authority for Brown to invest and manage it as trustee.

It was evidently the intention of the testator that the fund represented by the bank stock should be kept invested, as its earnings were the only means provided for the payment of the annual legacy to the Marrs. It is also evident that it was his desire and intention that it should continue invested as bank stock in the National Bank of Vandalia until these legacies were discharged.

If Brown had been named as executor in the will it would have been his duty to collect the earnings of the bank stock and to apply them in the payment of these legacies as long as Mrs. Marr or either of her daughters lived, and at their death to transfer the stock as provided in the will. This would have carried with it the duty to keep invested the fund represented by the bank stock, after the surrender of the national bank's charter, so as to produce earnings; for the payment of the annual legacies was as sacred a trust as the final transfer of the fund producing these legacies, and the legacies could only be paid out of the earnings of the fund.

This view of the duties of Brown, as administrator with the will annexed, was doubtless the view taken by the court in its decree of February, 1877, and is the reason why he was ordered to report his doings from time to time to the County Court of said Fayette County, the tribunal which had jurisdiction over the administration of the estate. Where a " controversy arises over the construction of a will and the distribution of trust funds in the hands of an administrator with the will annexed, a proper disposition of the case will not take the estate out of the hands of the County Court; but when the will is construed, and the rights of the parties determined, the settlement of the estate can proceed in the County Court." Minkler v. Simons, 172 Ill. 326.

The first proposition, then, of complainant in the cross-bill, that George W. Brown had no authority to manage or invest the trust fund, is not sustained.

The four hundred shares of stock represented two-fifths of the capital stock of the National Bank of Vandalia. It had been a highly prosperous financial institution. The testator did not contemplate that any change would be made in the investment during the lifetime of his sister, Mary K. Marr, or of the daughters, or either of them. After their death it was to be transferred to McKendree College and to the Board of Church Extension. He advises in his will that when the two hundred shares were transferred to McKendree College, they should remain as stock in said bank, and be managed and controlled by the representatives of said college. At the time of McCurdy's death no one questioned the prosperous condition of the bank, nor does there appear to have been any reason for questioning it. It was not, then, careless or improper management by Brown to allow said stock to remain invested as the testator had invested it, and desired that it should remain invested.

When the bank surrendered its charter in 1883, it was done because the stockholders believed it to be to their profit to do so. Three-fifths of the stock was owned and controlled by stockholders whose personal interest was

involved. It is not to be presumed that they acted rashly, or inconsiderately, or knowingly against their own interest. If they can not be considered as so acting, why should Brown be so considered?

They were co-stockholders with Brown as administrator, not by their own volition, but as a result of the disposition of his stock by the former president of the bank. They could not compel Brown to sell or transfer the stock, nor did they control the two-thirds of the stock necessary under the federal statutes to force a surrender of the charter and a dissolution of the corporation. In no sense then can they, if acting honestly, so long as the National Bank of Vandalia continues in existence, be treated as co-trustees with Brown, or as intermeddlers with the stock represented by him.

When the National Bank of Vandalia ceased to do business on the first of April, 1883, the Bank of Vandalia immediately succeeded it. The assets, the capital, the former stockholders (now partners), the place of business, and inferentially the deposits and the customers, were the same. It was, in other words, the same bank, conducted as a partnership instead of a corporation. If it seemed prudent and advantageous to practical business men, owning three-fifths of the stock, to continue the bank as a private bank, there is no reason shown why it should not have seemed equally prudent and advantageous to Brown, controlling two-fifths of the stock. It was his duty to keep it invested. It was the advice of the testator "that it be kept as stock in the bank as long as the bank may hold an existence as such." The only change was from a national bank under certain management to a private bank under the same management.

We see, then, no reason why Brown, as administrator, or as trustee, should be charged with carelessness or mismanagement in continuing the investment in the Bank of Vandalia on April 2, 1883, which had been in the National Bank of Vandalia on April 1, 1883. It is true that the relation of those who had been co-stockholders with him in the first named bank, was now changed to that of partners

with him.  It is also true that this new relation was of
their own volition, while the former was not.  They must
have known, too, that the funds he brought into the partner-
ship represented the stock he had controlled in the former
bank, and must have known, too, for what uses and purposes
it was held.  It is in evidence also and not contradicted,
that public notice was given of the investment.

George W. Brown testifies:  " The national bank law
compels national banks to give notice of liquidation.  We
gave that notice, and adjoining the same was notice of the
organization of the Bank of Vandalia, giving the name of
the stockholders.  The notice stated that I had the Mc-
Curdy money in the new enterprise."

He also testifies:  " I was elected a trustee of McKendree
College, I think, at the annual conference in 1891.  I at-
tended the commencement at which the board of trustees
have a session.  I told them I had the McCurdy fund in
stock of the Bank of Vandalia; that the national bank
had surrendered its charter; that it was a private bank and
the stock representing the $40,000 was merged into the
Bank of Vandalia, and that the income from it was being
used to pay the annuities as provided by the will, and com-
missions and so forth.  This is my best recollection as to
the report I made them.  I think that was in 1891.  I know
Rev. T. H. Herdman very well.  He was a professor of
the college, and I think its president for a short time.  He
was a member of its board of trustees.  I think it was in
1885 Mr. Herdman came to Vandalia, from Lebanon, and
inquired about the condition of the fund.  I told him its
condition and where it was invested."

Geo. W. Seaman testified that he was a trustee of Mc-
Kendree College from 1856 to 1883.  That he called the
attention of the board to the McCurdy bequest in 1877, and
that in 1883 he was " offensively persistent in demanding
that they apply business sense to their own interests and
take possession of this fund by " legal process if possible,
and by force if necessary," but that his proposition was
voted down.  He also testifies to a correspondence with Dr.

Kynett, the secretary of the Board of Church Extension, "ten years ago," in reference to the fund. From this testimony it is clear that the *cestuis que trust* had knowledge of the funds bequeathed to them. It affords also, strong grounds for presumption that they, too, knew of the manner of its investment, and so knowing, virtually acquiesced and consented to it.

Brown also testifies that the stock (of the National Bank of Vandalia) did not pay ten per cent dividends all the time, but that it was making ten per cent at the time of the change, and that for a few years after the change, the Bank of Vandalia made ten per cent.

We think, then, that the findings of the chancellor,· that McKendree College and the Board of Church Extension, during the entire course of said business, knew of said will, of Brown's appointment as administrator, of the decree of February, 1877, and that Brown had undertaken the management of the said fund, are warranted by the evidence; and that his conclusion that Brown had lawful·authority to manage said fund and to carry out the provisions of the will, until relieved by the death of the annuitants, or by an authorized appointment of a successor, is correct in fact and in law. We think, too, that the evidence fails to show that, under the conditions as they appeared at the time, the continuance of the fund as an investment in the Bank of Vandalia, after the surrender of the charter of the national bank, was "carelessness and mismanagement." If, then, these conclusions are right, Brown's co-stockholders in the National Bank of Vandalia were neither intermeddlers nor co-trustees with him while the fund remained in the bank. If as administrator he had authority to invest the fund in the Bank of Vandalia, and there was nothing to indicate that it was not honestly and discreetly invested, his partners did not become intermeddlers or co-trustees with him in the management of the fund for the sole reason that it was so invested with their knowledge and privity. It is held even that the knowledge of one partner that a trust fund is misapplied does not make his co-partners liable. 1 Bates on Part., Sec. 481.

If, then, they did not become chargeable as co-trustees because of the investment, it is clear that they would not become chargeable because, in the vicissitudes of business, honestly conducted, the investment proved unprofitable.

If, in making the investment, Brown had been guilty of a breach of trust, and his partners had knowledge of the breach, a different question would be presented. In such case the authorities cited by plaintiff in error would apply, and all the partners having such knowledge would be chargeable as co-trustees.

It is claimed by plaintiff in error, in argument, that the partners of Brown in the Bank of Vandalia, having knowledge of the character of the fund invested by him and of the limitation of its use to produce earnings for the payment of the Marrs annuities, are chargeable with a *devastavit*, or loss of the fund, by reason of unearned dividends declared and paid out of the capital of the bank. This question is not before us for review. The theory of the cross-bill is that the fund was invested by Brown without authority, and that being so invested with the knowledge of his co-partners, they became co-trustees with him in its management, and are therefore liable for it. Upon this proposition the decree of the chancellor finds against plaintiff in error, and we affirm the finding.

The claim that in the management of the bank that its capital was diminished by the payment of unearned dividends, and that this fact was known to the partners managing its business, and that in consequence of this, they have made themselves liable for the fund, presents an issue of fact, that does not appear in the pleadings. All parties interested should have had an opportunity to meet and contest it if they so desired.

In a proceeding in chancery against guardians for an accounting, it is said in Smith v. Smith, 4 Johnson's Ch. Rep. 281:

" The only complaint against the guardians is, that they did not collect the money of the executor, who duly received it. But there is no such neglect charged in the bill, and

they are not to be answerable for breaches of duty not charged in the bill. If it had been made a substantial allegation, they might, perhaps, have met and answered it fully and excused themselves completely from the charge of that neglect of duty."

A complainant is not permitted to make one case by his bill and another by his proof. Coale v. Moline Plow Co., 134 Ill. 355.

It is claimed by plaintiff in error that the amount of the fund to the extent of $40,000, invested in the Bank of Vandalia, should be a preferred claim against its assets. We see no reason, either in law or in equity, why innocent creditors of the Bank of Vandalia should be postponed in the payment of their claims until $40,000 is paid to McKendree College and the Board of Church Extension. If Brown was authorized to invest this money as the court below found, and we affirm, it became subject, so far as the rights and equities of innocent parties are concerned, to the vicissitudes of business, the same as any other capital invested, and no lien exists, in law or equity, to protect capital invested as against creditors doing business with the investors.

The decree then correctly orders that the receiver pay the creditors of the Bank of Vandalia, before delivering two-fifths of the remaining assets to the trustee, John Penn, complainant in the cross-bill.

No accounting by Brown is prayed for in the cross-bill. Under the prayer for general relief this might be decreed, if it appeared from the evidence and the pleadings to be necessary for the adjustment of the equities involved. It does not so appear. The estate is still unsettled, and under the decree of the Circuit Court of Fayette County of February term, 1877, before cited, including the trust fund claimed by complainant in the cross-bill, is in the County Court of said county for supervision and adjustment. This seems to be warranted by Minkler v. Simms, cited *supra*.

It appears also that a decree has been had in the Circuit Court of said county, appointing complainant in the cross-bill trustee of the fund in the place of Brown.

This involves a transfer of the fund from Brown to said trustee, and therefore an ascertainment, through an accounting by Brown, of the receipts and disbursements of 'his administration.

Perceiving no substantial error in the record, the decree of the Circuit Court is affirmed.

Mr. Justice Creighton, having tried this case in the court below, took no part.